The next appeal is Appeal Number 2010-1529 in Re Saunders. This case involves charcoal briquettes for cooking and the charcoal briquettes that are claimed in the application have grooves on them, grooves that are parallel grooves and spaced apart. So how does that differ from what's disclosed in Peters? That differs from Peters because Peters discloses that there had been some work done, very unclear as to what that work was, in ornamental design, geometric manipulation of charcoal briquettes and then the key language that the PTO keyed on was that there were flutes that had been experimented with in the past. No detail as to actually what that is, the only detail we have is what the board said which is that something like flutes in a column, but if you go back and you look at the pictures that are in the application for example, if you look at pages 82 of the appendix and 87-88 of the appendix, these are not flutes that were invented here and flutes don't teach you anything about the fact that they need to be spaced apart, that they need to be on a briquette. This is on the surface of a briquette, a column such as flutes that we're talking about is a round column that we're thinking about that has flutes that are immediately adjacent to each other that go around a circular or a cylindrical column. That has nothing to do with what's on the face of this briquette and in fact if it were, if it did in fact make it, in fact everyone agrees that Peters does not in fact, it does flow. I'm sorry, I'm not exactly clear. The sentence that's at issue is there's some work at the ornamental configuration of few briquettes as well as the geometrical conversion, so you're saying it's not clear that that was on the surface of the briquette? It's not clear what type of briquette is being discussed there and how the flutes would be implemented on the briquette. Are there various, are there lots of different types of briquettes? Sure. Peters actually talks about all different types of shapes and sizes, not that necessarily the pillow briquettes that we're talking about here. So it's not limited to a particular type, but if it's not limited to a particular type, couldn't that be construed as referring to all of them? Right. A broad disclosure for example, right? Okay. But it's possible, I suppose, that someone could look at this and come up with all different types of ideas. The issue here is does Peters actually disclose and teach someone to design the claimed briquette that's here? And the PTO agrees with us that in fact Peters does not actually disclose the claimed invention. Had they believed that, we would have had an anticipation rejection, right? So we're dealing with obviousness here and the question is can you take the leap from here which is... I mean it seems to me the only thing that's not disclosed in Peters is that the grooves extend substantially from one side of the periphery to an opposing side. That's certainly true and also that they are spaced apart on the surface of the briquette. That's not disclosed in Peters either, nor are the functional limitations that get you there disclosed in Peters either. I mean you talked about flutes, that's plural, so that's more than one. Agreed. Absolutely, I agree with that. And you talked about surface configuration. I agree with your honor that what is disclosed there are possible ideas of different ways that one might go about trying to design a briquette. But there's really no detail at all there to get to the extending across to the spaced apart. The problem that I'm having is that there's no detail involved in this claim. The invention is so simple that to argue that well the reference is lacking in detail is a stretch. Let me say that I agree that looking at it now it looks simple and I think that's a hindsight approach to what we have here. But think about what's going on here in Peters, there's a passing reference and it's a fleeting reference in there to work that had been done. Not work that Peters had done necessarily, but work that may have been done and results that may have come out. That was back in 1982 when this was filed. 24 years later in 2006, Clorox, the same company that filed this application, launched a product with spaced apart. To your comment, it does say that it may attempt, may enhance, it doesn't say that some work may have been done or am I missing something? I'm sorry, if I misspoke, it says work was done and it may enhance, I'm sorry if I misspoke. But it doesn't describe what that work was in any detail and I understand John's comment on that, that there's not that much detail in the claim. But let's talk about that. But the little missing detail that's there, I think is the difference between the claim and what was in the prior art is very important here because when you get 24 years later to Clorox's launch of a product which looks the same and the board agrees is the same as the claimed invention. But what is missing? You started to say what is missing. What is missing are several things. There, as Judge Lynn pointed out, extending across the entire surface, the spacing apart of the grooves, and the functional… But there's no detail on that, it just says it's spaced apart. It does say that, but there's functional limitation that gives you a result. Flutes would be spaced apart as well, because more than one flute means they're spaced apart. Correct? I'm not sure that that's true. The problem is you can look at it in many different ways. I guess there could be anything that's infinitesimally small, but flutes could mean all sorts of different things. Flutes could mean all sorts of different things, but let's step back. The PTO agrees with us, sitting here, there's no dispute here that there's no anticipation. So then the next question is, is it obvious? And the point I'm trying to make with respect to the Clorox launch in 2006 is you have a design that are spaced apart, grooved briquettes that extend across the entire surface of the briquette. And when Clorox launches that product in 2006, it says and tells its shareholders that that was the most significant innovation to regular charcoal since it was invented in the 1920s. Is there any evidence here to suggest that the reason for whatever commercial success is shown is due to the fact that these grooves extended the full length of the pillow? What we, what there is... As opposed to the existence of grooves, period. Just the concept of grooves in the path. The evidence that is shown is that the grooves that are on the Clorox briquette are in fact these spaced apart, they're exactly the same as what's in the patent and what's claimed in the claim. And everyone agrees with that. And then I'm sorry, the question Your Honor is, is there evidence that says that because it goes and wraps around the entire thing, that's what enhanced? Yes. But that's not what's disclosed. There's no groove in the sense of a groove that actually creates airflow that aids in the ignition and burning that's disclosed in the prior art. It's not just the extending across the entire surface of the briquette that is different between the claim. There's functional language that exists in the claim well beyond just the claiming of a spaced apart briquette. And that informs how that structure exists on the roof. It articulates what the result is of having these. But no, yes, it does. Right. No, no, it doesn't. You talk about combustion and ignition. Right. But that's sort of like the impact of what we're doing is. This is what happens as a result. What happens kind of happens naturally if you do this. I disagree with that. I think what is going on in the rest of the functional language is language that requires a certain structure to be made. Let's talk about the language of claim 150. That's what you're referring to. Correct. Okay. Right. So what you have in claim 150 is that after you get past what I guess would be the traditional structural language, at least two grooves spaced apart from one another and extending substantially from one side of the periphery to an opposing side, then you have functional language that follows, right? Aiding combustion. And this is the grooves that we're talking about here. Right. For aiding combustion by providing air circulation around and along the majority of the periphery. Right. You need to organize the grooves that are substantially across and spaced apart in such a way such that you get that result. Right. And along the majority of said periphery between one said briquette and at least another said briquette within a pile of briquette. There's nothing inherent in anything that Peter discloses that will get you to that result. The patent applicants teach you the design. Isn't that result simply a necessary property that necessarily inures from the scratch? I don't think there's any evidence to suggest that in the record. The only evidence in the record of what the prior art is, is this concept of fluting. Right. Nothing in the prior art says that you get this fast ignition time, you get this sustained burn time. It doesn't say that. In fact, Peter says you can't get both of those and doesn't say that you get a working briquette that enhances either. It's necessary that the prior art explicitly say that, if that is in fact the property that inures from the disclosed structure. Why? Because there's no evidence. I agree with the premise, but there's no evidence in the record to suggest that fluting, whatever that actually means. Let's say we just think of it as a column, right? A column that's sort of grafted onto a briquette. There's no evidence that that enhances the ignition and burn time. And Peters does suggest that some of these things, although it doesn't say which one, may enhance one or the other. It does say, and I think that's what your honor was pointing to, but it doesn't say that that becomes a working charcoal briquette. If this was something that was actually going to enhance and give a working charcoal briquette that could be marketed, then from 1982 when just a summary of work that was done and results that may have occurred was recorded, all the way to 2006 we saw nothing. We saw regular pillow briquettes being sold by Clorox. The market leader who had the ability to introduce anything into the market. And then once they introduce it, it meets with commercial success. And importantly, Clorox defines it as the most innovative new idea in charcoal. And that's Clorox. Clorox didn't have to say that. Clorox launches products. And because of that, and the Clorox literature is clear, because of the new innovative grooves, they achieve that commercial success. All right. You're into your rebuttal. I assume you want to reserve your time. I would thank you, your honor. All right. Very good. We'll hear from the opposing counsel. Mr. Rissell, good morning. Good morning. May it please the court. The board correctly found in this case that there was just a minimal difference at best between the Peters prior art and the broad recitation of the charcoal briquette in claim 150. Counsel for Saunders questioned what the meaning of flutes were, but we know from the record that flutes means grooves, and grooves that are the type that are found on an architectural column, parallel grooves that extend along the surface of the charcoal briquette as described in the Peters reference. That was found by the board twice in the record. It's in the board decision, and it was also brought up during the oral hearing where Judge Tim said that when he hears the word flutes, he thinks of it as... But why isn't Mr. Kelman correct that the commercial success of this product, the recent commercial success in combination with the advertisement that went through it touting the novelty and the freshness of this new idea, why isn't that sufficient to overcome? I mean, that's what we're supposed to do. We're supposed to weigh the commercial success of a product, and here Mr. Kelman has the commercial success combined with that success itself touting the novelty of this idea. Why isn't that probative? I think for several reasons. First of all, there's such a strong prima facie case of obviousness in this case based on the substantial evidence in the record in Peters that even substantial evidence of secondary considerations won't be able to overcome that. But more specifically, there are several reasons why Saunders can't show a nexus to the patently distinct portion of Claim 150. Judge Lynn touched on this before. There's no evidence in the record that shows that the commercial success is due to the grooves extending the full length of the charcoal briquette. We know in the prior art, through Peters, that it teaches charcoal briquettes that have grooves on the surface and these grooves are parallel and thus they're spaced apart, but Peters may not show that it actually extends along the full length of the briquette. So in order to prove a nexus to something that was not known in the prior art, they would have to show that the secondary considerations, the commercial success, was based on the fact that these grooves extended beyond what was taught in Peters to the edge of the periphery of the briquette in order to establish the nexus, and they can't do that in this case. I guess I'm having trouble. You started by saying there's a balancing act here. I think we just got rid of some balancing in connection with inequitable conduct and materiality and intent. It's kind of hard. Are there cases that articulate what that balance is? Is it very strong obviousness as opposed to we're going to throw it out on obviousness but we've got a weak obviousness case? It's kind of hard for me to really apply that continuum of very strong versus weak on obviousness. I think both the Leapfrog Enterprises case and the Wires v. Master Lock case both explain that it is kind of a sliding scale, that if there is a very strong prima facie case of obviousness, even a substantial evidence of commercial success or secondary considerations won't be able to overcome that very strong prima facie case of obviousness. And they entirely have the burden on commercial success? In other words, you raised the question, yes, there's commercial success, there's no dispute about it, but then the question is to what extent that commercial success is attributable to the length, and that's clearly their burden in your view? That's absolutely correct because, as this Court stated in Ray Huang, we don't have the ability to go out and gather evidence to refute their evidence of commercial success. So we rely on them to provide us the evidence, and so we have to look at the totality of the record that's provided to us to establish whether or not there's commercial success. In the Oracle case, we said that if the product that is the subject of the commercial success is co-extensive with the scope of the claim, that that creates a presumption of nexus. That's correct, but in that case... In this case, here we have a product that is alleged to have been commercially successful, and that product is co-extensive with the claim. Would you agree? The Board did find that, but in the ARM case... If that's true, then, and I'll let you answer in a minute, if that's true, that would, according to ARMCO, create a presumption, correct? That then the Patent Office would have to overcome? If that, in a litigation, an inter-party litigation, that would create a presumption, but not in an ex parte examination context. So your argument that the presumption in ARMCO doesn't apply in an ex parte context? That's correct. Have we ever held that explicitly? I don't believe we've explicitly held that, but I think the holding in Hwang would support that. Why should it not apply in the context of the Patent Office proceeding? Because we don't have the capability of going out and finding additional evidence to refute or rebut the information that's given to us during the examination process. So we have to rely solely on the evidence that's in the record. Right, but the refute or rebut, I mean, I've seen a lot of infringement cases, and they never refute or rebut it with other sales evidence. It's always refuting or rebutting with, well, the advertisement doesn't tout these advantages, they tout those, the very things the Board had in front of it. So I'm not following why what you do in the case of assessing commercial success is any different than what litigants would do in a private litigation. Well, because then we wouldn't have the ability to go out and get surveys or additional information. I've never seen a survey in an obviousness case. Five years, four months on the bench. So I don't see what is different between what the PTO, I don't see why ARMCO shouldn't apply to the PTO. I think the difference is the underlying forum in which the decision is being made. One is being made in an adversarial inter partes litigation where there's full discovery, and the other is being done ex parte before the Patent Office. Yeah, but ex parte before the Patent Office, you all have the burden, don't you? They don't have to, do they have to establish validity, or do you have to, in order to reject them by a preponderance of theory? If the evidence is established that the patent is not, the claim is not entitled to a patent. Who has the burden in an examination? Who has the burden of persuasion? The applicant has the burden of persuasion. So they have to establish that their claim is patentable, or you have to establish in order to reject it that it's not? Doesn't the statute say a person is entitled to a patent unless? I actually think it's detailed. I think it's 102 and 103, I think that's the statute. Okay, I may have misunderstood it. An applicant is entitled to a patent unless? Okay, I'm sorry, I think I may have misunderstood your question. Yes, the Patent Office has the burden of putting forward evidence and prior art to show that, to make a case of obviousness or unpatentability. To support a rejection. That's correct. So if the Patent Office has the burden of persuasion, it has the burden of persuasion at all times. We're only talking about switching the burden of production back and forth. You've met your case with prima facie evidence and they have the burden of production of coming forward with something to rebut it. But if you have the burden of persuasion at all times, why shouldn't ARMCO equally apply to you? It seems that that presumption should have favored them in this case. Well, in this case, we've already established a strong prima facie case of obviousness. But I don't buy into the notion that a strong prima facie case of obviousness is a get-out-of-jail-free card with regard to secondary consideration. I don't think Leapfrog stands for that proposition. I think Leapfrog very carefully says in this case, the strong prima facie case of obviousness we didn't need to overcome. That was after the court considered the secondary consideration evidence and discussed it. I don't see any of our cases giving a free pass. There's a strong prima facie case so you don't even have to consider secondary considerations. In fact, I know I personally have been involved in multiple cases where we reverse district court judges for unfortunately making that mistake and saying I don't even have to look at them. Right, and I'm not saying that the PTO doesn't have to look at secondary consideration cases when there's a strong prima facie case. The record shows in this case that the board did review all of the evidence in the record regarding to commercial success and secondary considerations and they did the proper weighing and they weighted against the disclosure of Peters and found that Peters was a strong prima facie case there was only a minimal difference between the two and that based on that and based on the problems with the commercial success evidence submitted by Saunders that it strongly weighed in favor of finding the claims on patent bulletin obvious. And again, I think this goes back to Judge Lynn's point that Saunders did not provide any evidence to the Patent Office that showed that the commercial success was because the grooves extended the full length on the charcoal briquette. I'm wondering if that's their obligation when they are actually showing that the product is identical to the claim and they've been commercially successful. They still have to show a nexus to something that did not exist in the prior art. So the nexus has to be something novel and here Peters discloses that there are grooves on the surface of the charcoal briquette and I think the only difference is whether or not those grooves extended from one periphery to the other. And so in order to show a nexus they have to tie that to the part of their invention that was not known in the prior art. And in this case the only difference is the extension of these grooves on the surface of the charcoal briquette to the edge of the charcoal briquette. What do you take away from Peters in terms of it saying that such attempt may enhance ignition for overall combustion as opposed to saying these flutes will enhance combustion but rather they may. I mean Peters seems a bit equivocal and of course then it goes on to somewhat disparage by saying these wouldn't provide the optimal ignition and burning characteristics. What do you make of that? They argue it amounts to teaching away I understand the government says it doesn't amount to teaching away but there's quite a bit of equivocation in the statement. These things might help ignition and combustion and not even flutes in particular but like this long string of things we've just listed. Right but I don't think that equivocation rises to a teaching away. There is language in Peters that teaches away. It's in the following paragraph. It's at the bottom of column one beginning at line 63 where it's talking about using powdered metal and oxidizers in a charcoal briquette to enhance ignition and what it says there it says however very rapid delivery of intense heat does not provide an acceptable combustion response for cooking purposes and such priority adjustments have made no attempt to quantify or optimize such ratios. That's a clear teaching away. Now when you compare that to the language above it in Peters what Peters teaches is that you can enhance ignition or burning and you can enhance ignition and overall combustion by including these grooves or these flutes on the surface of the charcoal briquette and by doing so you increase and enhance the air supply so it's the same way as recited in claim 150. So I don't believe that there is any level of equivocation or teaching away that would in any way disqualify Peters from establishing substantial evidence on the such attempts may enhance ignition. Not can not will, but may and may might mean there are some variations of ribs flutes, grooves and slots that won't. Isn't that what that teaches to the average person for understanding the may language that some flutes might, some flutes might not. Some ribs might, some ribs might not. Maybe ribs do but flutes don't. Maybe grooves do but who knows about slots. That's the equivocation I'm referring to is that Peters doesn't so strongly as you're asserting say that flutes will enhance ignition and combustion. All flutes, any flutes flutes that extend the full length, flutes that only go half way. It doesn't give any of that level of detail. I believe that looking at the sentences before that, it says that there's been some work at ornamental configuration of fuel briquettes as well as geometrical configuration of briquettes to enhance ignition or burning by enhancing air supply such as provision of external surface discontinuity such as ribs, flutes, grooves, slots or the like. The fact that it says that such attempts may enhance commencement of ignition or overall combustion but do not provide desired optical ignition and burning characteristics, I think it's just calling a difference between those two things. It's still saying that one of ordinary scholarly art reading this would still recognize that using flutes would enhance the burning or ignition even though it may not optimize it. Alright. Thank you very much. Here from Mr. Kelman. If I may, let me clarify what I think the importance is of the Clorox evidence because I think it goes to two issues. One is the commercial success argument that we've been talking about but the other is to what exactly does Peters disclose. I think we have a unique situation here where the prior art reference that's being relied on is ultimately commented on by the same party that created that prior art reference. We have that in the record here. The question I was asked earlier which is what is the new thing that's there? Is it extended across? Is it spaced apart? Is it some of the functional language? Whatever it is, for a moment Clorox said at the end of the day that its product which had all the parts of the claim in it that that was a brand new thing in 2006. It goes not necessarily only to the commercial success which it certainly goes to but it also goes to the strength of the prima facie case of obviousness. Clorox said that the full claim because their product is the same as the claim said that the full claim was novel. That weakens the initial case of obviousness and then when you get to the commercial success prong you have commercial success that goes to a novel component. It has to go to a novel component because Clorox told you it's novel. What we have here is a very passing reference. Let's think about again what Peters actually is. Peters is trying to develop a way to enhance the cooking properties of these briquettes and by enhancing those Peters decided to go in a completely different direction. Clorox had all that time during the 1980s and the 1990s and the early 2000s to develop a product in accordance with Peters and it didn't. How could that given the record that we have here, it's not a strong prima facie case of obviousness. There's nothing other than the litany of different possible options excuse me, possible options which is more what's referring to that are in there that may help to enhance the ignition, enhance the burning properties. But there's nothing in Peters that actually tells you to go in that direction. It teaches a way and Clorox itself never heeded the advice that the PTO says is in Peters. Thank you. Alright, thank you very much and thank you both counsel. The case is submitted and that concludes this morning's session.